UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE APPLICATION OF: ▋ <br><br> REQUEST FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | CASE NO. _____ |

**DECLARATION OF ▋ IN SUPPORT OF ▋ _EX PARTE_ APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

I, ▋ under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, declares that the following is true and correct:

1. I respectfully submit this declaration in support of the application of ▋ ("▋" or the "Applicant") for discovery pursuant to 28 U.S.C. § 1782. I confirm that I am duly authorized to make this statement on behalf of the Applicant.

2. The facts and matters set out in this statement are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

3. I am the Executive Director of ▋ In this role, I am responsible for managing the ▋ Project (described below) and remain as such through the present.

4. ▋ is a company incorporated in Russia for the purpose of building, owning, and operating the ▋ Project (the "Project"), which consists of a fertilizer production plant with an annual capacity of about 1.7 million metric tons. The Project was originally budgeted at approximately EUR 1.4 billion. The Project had a guaranteed completion date with the turnkey contractors (described below) of August 2023.

1

5. When completed, the Project will make a significant contribution to global food security.

6. ▇ is 100 percent owned by MCC ▇ JSC, which in turn is 100 percent owned by ▇ ("▇ and together with its subsidiaries, "▇

7. ▇ is one of the five largest global manufacturers and suppliers of fertilizers and related chemical products in the world, with over 30,000 employees and annual revenues exceeding $10 billion.

8. Before I became involved in overseeing the Project, I was responsible for managing the ▇ ("▇ Project"). The ▇ Project is a separate large fertilizer plant adjacent to the ▇ Project. Turnkey construction of the ▇ Project was contracted out on substantially the same terms as the ▇ Project to the same two contractors: ▇ ("▇ an Italian corporation, and its Russian affiliate, ▇ ("▇ and collectively with ▇ the "Contractors"). The Contractors are within the same corporate group, and both share the same ultimate parent, ▇ ("▇ an Italian corporation.

9. ▇ is a publicly-listed company traded on the Italian stock exchange and headquartered in Milan, Italy. ▇ ("Respondent" or "▇ is the Founder of ▇ He is also the Chairman of the Board and controlling shareholder of ▇ Additionally, ▇ is the majority ultimate shareholder of ▇ and ▇ Thus, while ▇ has an interest in ▇ it is still a separate legal entity.

10. ▇ an Italian citizen and prominent businessman, is often photographed in the company of the President of Italy or other high-ranking Italian government officials. According to members of the Project team, ▇ was involved in obtaining the Project Agreements (defined below) for ▇ and stressed his high-level connections with Italian

2

government agencies, connections that ▮ touted would provide ▮ with financing and administrative support for the Project.

11. On June 1, 2020, ▮ entered into three contracts for the design, engineering, procurement, construction, commissioning, and testing of the Project. Those contracts were:

    a. The onshore engineering, local procurement, and construction contract dated June 1, 2020, entered into by ▮ and ▮ (the "Onshore EPC Contract");

    b. The offshore engineering and procurement contract dated June 1, 2020, entered into between ▮ and ▮ (the "Offshore EPC Contract"); and

    c. The coordination and interface agreement dated June 1, 2020, entered into between ▮ ▮ and ▮ ("Coordination and Interface Agreement"; collectively with the Onshore EPC Contract and the Offshore EPC Contract, the "Project Agreements").

12. ▮ the Contractors' parent company, guaranteed and indemnified their obligations under the Project Agreements.

13. Both the Onshore EPC Contract and the Offshore EP Contract required the Contractors to provide ▮ with on demand payment bonds in the total amount of EUR 244,785,694 (on the date upon which they were called by ▮ in 2022, approximately $271.2 million at today's exchange rates). I list below the bonds issued by the Contractors' issuing banks (collectively, the "Bond Issuers") to ▮ and the values of each of the bonds as of the date that they were called:

    a. Bond No. 17002-0059299ETR, for EUR 12,660,113, dated September 30, 2020, issued to the Applicant by Société Generale Paris;

    b. Bond No. 17002-0061491ETR, for EUR 637,954, dated February 26, 2021, issued to the Applicant by Societe Generale Paris;

    c. Bond No. 17002-0059306ETR, for EUR 74,470,755.36, dated October 2, 2020, issued to the Applicant by Societe Generale Paris;

    d. Bond No. 17002-0617121ETR, for EUR 9,808,200.25, dated March 25, 2021, issued to the Applicant by Societe Generale Paris;

  e. Bond No. 08502-0009506MIL, for EUR 39,589,203, dated September 30, 2020, issued to the Applicant by Societe Generale Milano;

  f. Bond No. 039W4X, for EUR 29,887,754, dated May 28, 2021, issued to the Joint Stock Company Alfa-Bank;

  g. Bond No. DLG 1440/20, for EUR 75,285,299.85, dated November 3, 2020, issued to the Owner by ING Bank N.V. (Milan Branch); and

  h. Bond No. 03WD4X, for EUR 2,446,414.86, dated August 5, 2021, issued to the Owner by Joint Stock Company "Alfa-Bank" (as to all these bonds collectively, the "Bonds").

14. ▓▓▓ counter-guaranteed any payments under the Bonds by the Bond Issuers.

**Termination Notices and Payment Demands Under The Bonds**

15. The Contractors breached their obligations under the Project Agreements, including wrongfully suspending and abandoning the Project under both the Offshore EP Contract and Onshore EPC Contract. As a result, on August 4, 2022, ▓▓▓ sent:

  a. Termination notices to ▓▓▓ and ▓▓▓ under their respective contracts ("Termination Notices");

  b. Demands to the relevant issuing banks for each of the Bonds (Société Generale S.A., Société Generale Paris, Société Generale – Milano Branch (described as Société Generale Milano; collectively, "SocGen"), ING Bank N.V., and ING Bank N.V – Milan Branch (together, "ING"); and

  c. A letter to the Contractors' parent company, ▓▓▓ informing it of the Termination Notices and ▓▓▓'s intention to recover its losses from the Contractors and/or from ▓▓▓ under the parent company guarantees it provided.

16. Despite the fact that the Bonds were "on-demand," meaning that payment under them was required upon demand by ▓▓▓ the Bond Issuers refused to pay ▓▓▓ the amounts due thereunder.

17. As a result, on August 19, 2022, ▓▓▓ brought an action against the Bond Issuers in the High Court of Justice in the Business and Property Courts of England and Wales,

4

King's Bench Division Commercial Court in London, Claim No. ▮▮▮▮ ("UK Action").

18. The UK Action is ongoing. The defendants in the UK Action are the Bond Issuers. In the UK Action, ▮▮▮▮ seeks payment from the Bond Issuers under the Bonds.

19. The Bonds' proceeds have been assigned by ▮▮▮▮ to ▮▮▮▮ which has joined as a party to the UK Action.

20. ▮▮▮▮ also applied for and was admitted to the UK Action as an interested third party.

**Background To The Suspension And Termination Of The Project Agreements**

21. The Project was contracted to the Contractors on a lump-sum, fixed-fee basis with an original budget of approximately EUR 1.4 billion and a required completion date of August 2023. Notwithstanding this required completion date, ▮▮▮▮ was responsible for delays and mismanagement to the Project, causing ▮▮▮▮ to anticipate incurring large losses and liquidated damages of up to hundreds of millions of dollars.

22. The Contractors sought substantial additional time to complete the Project and additional payment of EUR 280,718,431 (approximately $306 million at today's exchange rates), threatening to suspend work unless these demands were met.

23. After protracted negotiations and having already paid the Contractors more than EUR 575 million (approximately 40 percent of the total fixed price of the Project Agreements), ▮▮▮▮ rejected these demands.

24. ▮▮▮▮ then notified ▮▮▮▮ that it was suspending services under the Offshore EP Contract ("EP Suspension Letter"). ▮▮▮▮ position was that services were being suspended immediately, as performing the Offshore EP Contract would "cause

5

Contractor to be in breach of the restrictions imposed by regulations issued by the Republic of Italy and European Union."

25. However, these export restrictions prevented the export of only certain dual-use goods and technology (i.e. goods and technology that can be deployed both for normal commercial purposes, such as for the construction of the Project, or for military purposes). These restrictions meant that a license was required for certain equipment being supplied by ▮.

26. In the EP Suspension Letter, ▮ informed ▮ that it had submitted approximately 70 license requests to the Italian sanction authority ("CFS," a part of the Italian Ministry of Economy and Finance). However, ▮ suspended work before the license requests were considered (and some have been approved, as discovered later).

27. As set out in ▮'s response on May 18, 2022, ▮ considered that suspension to be unjustified.

28. On May 11, 2022, ▮ suspended performance under the Offshore EP Contract, falsely asserting that it was impossible to continue providing the offshore services due to export restrictions adopted by the EU in connection with the Russia-Ukraine conflict.

29. Similarly, on May 24, 2022, ▮ suspended its performance under the Onshore EPC Contract, falsely alleging, *inter alia*, that:

   a. the suspension of ▮ activities led to a temporary impossibility of performing the Onshore EPC Contract; and

   b. the geopolitical situation caused an interruption of delivery of certain materials and equipment constituting force majeure under the EPC Contract.

30. Most services were not prohibited by trade sanction regulations, and licenses or derogations could have been obtained for delivery of regulated materials such that the Project could have been completed. Nevertheless, the Contractors abandoned the Project and refused to perform their contractual obligations under the Project Agreements.

### █████ Terminates The Project Agreements And Is Completing The Project

31. ██████ has taken over completion of the the Project and has spent more than $900 million in connection therewith in addition to more than $600 million already paid to ██████ Completion is expected by March 2026, at which time ██████ will have incurred more than $500 million in additional costs over the turnkey price provided for in the Project Agreements and suffered a delay in completion of over 30 months. ██████ will suffer severe loss of profits during this time period.

32. On August 4, 2022, ██████ called for payment under the Bonds. The Bond Issuers refused to make payment. For that reason, ██████ commenced the UK Action against them as described above.

### Neither ██████ Nor ██████ Is Sanctioned In Any Relevant Jurisdiction

33. As I explain in more detail below, ██████ ██████ and the wider ██████ Group are not sanctioned entities. They are also not owned or controlled by a sanctioned individual.

34. It is undisputable that none of these entities is sanctioned in the UK or the U.S. Specifically, both the U.S. and UK governments have determined that ██████ is not owned or controlled by ██████ (a sanctioned individual who previously controlled the ██████ but who resigned from all management and ownership roles before sanctions were imposed in March 2022) or any other sanctioned individual. Attached hereto as **Exhibit 1** is a true and correct copy of the U.S. finding that ██████ ██████ is not a sanctioned entity.

35. Similarly, many other countries, including Switzerland and the major EU countries – Germany, the Netherlands, France, Austria, Belgium, Ireland and Poland amongst others – have confirmed that members of the ██████ are not sanctioned. Likewise, ██████ assets are not frozen, business dealings with the group's companies are

7

not restricted, and ▉ making available funds or resources to or for the benefit of the ▉ companies does not contravene any applicable EU, UK, or Swiss sanctions regulations.

36. The only significant outlier is Italy, which identified ▉ ("▉ ▉ as a blocked entity. ▉ is ▉ Italian subsidiary.

37. On September 27, 2022, Italy issued a written decision (the "Italian Declaration") freezing the shares of ▉ after ▉ had terminated the Project Agreements and demanded payment on the Bonds, finding it was subject to an asset freeze because it was allegedly "attributable to" ▉ a sanctioned individual. Attached hereto as **Exhibit 2** is true and correct copy of the Italian Declaration.

38. The timing of Italy's decision to announce that ▉ is a blocked entity (on the basis that its parent, ▉ was allegedly controlled by ▉ ▉ is highly suspicious, and its determination is manifestly wrong. Among other things, it calls into question whether Respondent or persons under his direction or control lobbied the Italian authorities or provided the Italian authorities with misleading information to provide ▉ with a justification for suspension of the loss-making Project Agreements and to protect it from paying millions of dollars on its counter-guarantee when the Bonds were called. If this occurred as ▉ reasonably believes it did, Respondent could be liable for massive damages, which ▉ intends to pursue in an anticipated Italian action ("Italian Action").

39. The following chronology sets forth the suspicious timing of Italy's determination:

   a. On March 9, 2022, sanctions were imposed by the EU on many Russian businessmen, including ▉ ▉ founded but no longer owned or controlled by ▉ was not listed as a sanctioned entity.

    b. On August 4, 2022, ▇ terminated the Project Agreements following the Contractors' default on August 4, 2022.

    c. On August 4, 2022, ▇ called for payments on the Bonds, and the Bond Issuers refused to make payments thereunder.

    d. On August 19, 2022, ▇ brought the UK Action, seeking payment on the Bonds.

    e. On September 27, 2022, Italian authorities issued the Italian Declaration, freezing the shares of ▇ ▇

    f. In October 2022, ▇ ▇ commenced an action against the Italian Ministry of Economy and Finance in Italy to annul the Italian Declaration based on their incorrect belief as to its ownership and control ("Italian Sanctions Action").[1] With the acquiescence of the Italian authorities, ▇ intervened in the Italian Sanctions Action to support the position of the Italian authorities (in direct contradiction of its contractual obligation under the Project Agreements requiring it to seek licenses from the Italian government should sanctions issues arise).

40.    ▇ has retained Italian counsel to advise it on a possible action against Respondent in Italy. ▇s retained Italian counsel has advised ▇ that such an action can be brought and that evidence obtained in connection with this Application can be used in proceedings in Italy.

---

[1] ▇ is not a party to the Italian Sanctions Action or the UK Action.

I, ███████████, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 27.04.2025       ███████████