UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE APPLICATION OF:<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>REQUEST FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | CASE NO. _____ |

**DECLARATION OF** ▮▮▮▮▮▮▮▮
**IN SUPPORT OF** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ***EX PARTE* APPLICATION
FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

I, ▮▮▮▮▮▮▮▮ under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C § 1746, declare that the following is true and correct:

1. I am a solicitor of the Senior Courts of England & Wales (Higher Rights of Audience), a partner/solicitor with Vinson & Elkins located at 20 Fenchurch Street, 24th Floor, London EC3M 3BY, United Kingdom.

2. I have been retained by the Applicant, ▮▮▮▮▮▮▮▮▮▮▮▮ ("Applicant" or "▮▮▮▮▮▮") by which I am authorized to make this declaration.

3. Save as otherwise appears, the facts set forth herein are within my own knowledge or derived from documents in my possession. I respectfully submit this declaration in support of ▮▮▮▮▮▮'s application for an order pursuant to 28 U.S.C. § 1782 to conduct discovery for use in a foreign proceeding.

4. If called as a witness, I could and would testify to the same as stated herein.

5. I am not authorized and I do not intend to waive any legal advice, litigation, or other privilege by referring to any matters in this affidavit.

1

6. ▮▮▮ seeks discovery from ▮▮▮ ("▮▮▮" or "Respondent") for use in an ongoing litigation in which ▮▮▮ is a claimant before the High Court of Justice in the Business and Property Courts of England and Wales, King's Bench Division Commercial Court in London in the matter ▮▮▮ ("UK Action"), as well as in a current litigation in Italy against the Italian Ministry of Economy and Finance pending before the Administrative Regional Tribunal of Lazio, Italy ("Italian Sanctions Action"), and for use in an anticipated litigation to be brought by ▮▮▮ in Italy.

7. My firm represents ▮▮▮ in the UK Action, and I am counsel of record for ▮▮▮ in the UK Action.

8. ▮▮▮ is a company incorporated in Russia for the purpose of building, owning, and operating a fertilizer plant with an annual capacity of 2.5 million metric tons, located in the city of ▮▮▮ Leningrad Oblast, the ▮▮▮ Project (the "Project").

9. ▮▮▮ is 100 percent owned by MCC ▮▮▮ JSC, which in turn is 100 percent owned by ▮▮▮ ("▮▮▮ and together with its subsidiaries, "▮▮▮").

10. ▮▮▮ ("▮▮▮" an Italian corporation, and its affiliate, ▮▮▮ ("▮▮▮" a Russian corporation, were the contractors on the Project (as to ▮▮▮ and ▮▮▮ together, "Contractors"). The Contractors are within the same corporate group, and both share the same Italian parent corporation, ▮▮▮ ("▮▮▮

11. As referenced in the contemporaneously filed Declaration of ▮▮▮ in June 2020, the Contractors entered into three contracts with ▮▮▮ (the "Project Agreements"). The Project Agreements required that the Contractors provide ▮▮▮ with on-demand payment bonds and also a parent company guarantee, with a total amount of EUR 244,785,694 (on the date

2

upon which they were called by ▇ in 2022, approximately $271.2 million at today's exchange rates).

12. As referenced in the Declaration of ▇ eight bonds were issued to ▇ by the Contractors' issuing banks and were guaranteed by the Contractors' parent company, ▇ (as to these bonds collectively, the "Bonds").

13. I am instructed that as a result of ▇ mismanagement of the Project, it was significantly delayed, causing ▇ to anticipate that it would incur large losses and liquidated damages of possibly hundreds of millions of dollars. I am further instructed that as a result of these delays and anticipated losses, the Contractors sought substantial additional time to complete the Project and additional payment of EUR 280,718,431 from ▇ (approximately $306 million based on current exchange rates). The Contractors threatened to suspend work on the Project unless ▇ met the Contractors' demands.

14. ▇ refused the Contractors' demands.

15. In June 2022, the Contractors abandoned the Project Agreements.

16. In early August of 2022, as a result of the Contractors' breaching their obligations under the Project Agreements, ▇ sent termination and demand notices to the Contractors. Specifically, ▇ sent: (i) termination notices to ▇ and ▇ under their respective contracts ("Termination Notices"); (ii) demands to the relevant issuing banks for each of the Bonds (as to these banks, the "Bond Issuers"); and (iii) a letter to the Contractors' parent company, ▇ informing it of the Termination Notices and ▇'s intention to recover its losses from the Contractors and/or from ▇ under the guarantees that ▇ had provided.

17. Notably, under the Bonds' terms, each Bond Issuer was obligated to pay the amount stated in the demands by August 10, 2022 – four business days after receipt of the demand.

18. Notwithstanding this requirement and ████s demands, the Bond Issuers refused to pay ████ the amounts due thereunder, giving rise to the UK Action.

19. A basis for the Bond Issuers' refusal to pay is the incorrect belief that ████ and/or ████████ (which has joined the UK Action as an additional claimant) are sanctioned entities. Thus, making performance on the Bond Issuers obligations illegal in Europe, and Italy specifically.

20. Specifically, the Bond Issuers wrongly assert that ████ is owned and/or controlled by one or more sanctioned persons. It is not.

21. ████ and/or ████████ are not sanctioned entities in any relevant jurisdiction – and the disposition of this is a key issue to be determined in the UK Action, as set forth further below.

22. On August 19, 2022, ████ brought the UK Action against the Bond Issuers seeking payment on the Bonds.

23. The Bond Issuer-Defendants include: Société Generale S.A., Société Generale Paris, Société Generale – Milano Branch (described as Société Generale Milano; collectively, "SocGen"); and ING Bank N.V., and ING Bank N.V – Milan Branch (together, "ING").

24. ████ applied and was admitted to the UK Action as an interested third party.

25. ████ is not a party to the UK Action. There is no expectation that he will become one.

26. Under UK law, ████ should be considered a separate legal entity from ████.

27. ████ has assigned the proceeds of the Bonds to ████████

28. By its request and the order of the UK Court dated March 17, 2025, ▮▮▮▮▮▮ was added as an additional party to the UK Action.

29. Neither ▮▮▮▮ nor ▮▮▮▮▮▮▮▮ are sanctioned entities. They are not named on any sanctions list or owned or controlled by any sanctioned individual. It is indisputable that these entities are not sanctioned in the U.S. or the UK. Specifically, both the U.S. and UK governments have determined that ▮▮▮▮▮▮ is not owned or controlled by ▮▮▮▮ a sanctioned individual who had previously controlled ▮▮▮▮▮▮ but who had resigned from all ownership roles before sanctions were imposed on March 8, 2022 and who had resigned from all management roles immediately after he was sanctioned.

30. On September 27, 2022, Italian authorities issued sanctions against ▮▮▮▮ ("▮▮▮▮ ▮▮▮▮▮▮ Italian subsidiary, finding it was subject to an asset freeze because it was allegedly "attributable to" ▮▮▮▮ ▮▮▮ a sanctioned individual (as to these sanctions, the "Italian Declaration"). As such, Italy is a significant outlier, and Italy's basis for freezing the assets of ▮▮▮▮ is suspect and patently baseless. The Italian Declaration calls into question whether Respondent or persons under his direction or control lobbied the Italian authorities or provided the Italian authorities with misleading information to provide ▮▮▮▮ with a justification for suspension of the loss-making Project Agreements and to protect it from paying millions of dollars on its counter-guarantee when the Bonds were called.

31. The timing of Italy's decision to announce that the assets of ▮▮▮▮ were subject to an asset freeze is highly suspicious, as set forth by the below chronology:

   a. On March 9, 2022, sanctions were imposed by the EU on many Russian businesses and individuals, including ▮▮ ▮▮▮▮▮▮ was not listed as a sanctioned entity.

   b. On August 4, 2022, ▮▮▮ terminated the Project Agreements following the Contractors' default.

5

c. In early August of 2022, ▮▮▮▮ demanded payment on the Bonds.

d. On August 19, 2022, ▮▮▮▮ brought the UK Action, seeking payment on the Bonds.

e. In October 2022, ▮▮▮▮ commenced an action against the Italian Ministry of Economy and Finance in Italy to annul the Italian Declaration based on the Italian Ministry's incorrect belief as to ▮▮▮▮ ownership and control ("Italian Sanctions Action"). With the acquiescence of the Italian authorities,[1] ▮▮▮▮ intervened in the Italian Sanctions Action to support the position of the Italian authorities (in direct contradiction of its contractual obligation under the Project Agreements requiring it to seek licenses from the Italian government should sanctions issues arise).

32. In the UK Action, a defense on which the Bond Issuers heavily rely concerns the Italian Declaration. Specifically, they assert as a defense that they could not pay the Bonds, despite the fact that they were "demand bonds" – meaning payable on demand without reference to the merits of the substantive dispute between ▮▮▮▮ and the Contractors – because ▮▮▮▮ and ▮▮▮▮ were purportedly subject to sanctions in the EU based on the Italian Declaration. The Bond Issuers allege that this prevented the Bond Issuers from making any payments to ▮▮▮▮ as to do so would purportedly violate applicable law in the Bond Issuers' home countries. Those countries are France and Italy in the case of SocGen and the Netherlands and Italy in the case of ING.

33. ▮▮▮▮ contends otherwise as to sanctions. ▮▮▮▮ asserts that the Bonds are governed by English law (undisputed) and that neither ▮▮▮▮ nor ▮▮▮▮ is subject to sanctions in the UK or in any relevant jurisdiction. Whether under English law the Bond

---

[1] Notably, I am instructed that ▮▮▮▮ position in the Italian Sanctions Action directly contradicted its contractual obligations under the Project Agreements, requiring it to seek licenses from the Italian government should sanctions issues arise.

Issuers are prevented from making payment on the Bonds due to Italian Declaration will be determined in the UK Action.

34. In the UK Action, ▮ has sought to avoid disclosing documents referencing ▮ and ▮ General Counsel stated in a witness statement in the UK Action that "the only individuals who have communicated on behalf of ▮ with sanctions authorities …. of France, Italy and/or Cyprus … were myself and Mr. ▮ Thus, ▮ admits that it had been in communication with sanctions authorities but carefully drafted its witness statement, excluding ▮ and ▮

35. To date, ▮ has vigorously opposed discovery – and specifically as from ▮ Indeed, ▮ have provided a total of only 9 documents (and none from Respondent) in the entire UK Action. By way of comparison, ▮ and other parties have produced thousands of documents.

36. ▮ sought to add ▮ as a custodian for disclosure, but the court in the UK Action refused.

37. Information concerning the Italian and French authorities basis for determining that ▮ was owned or controlled by a sanctioned person would be highly relevant information in the UK Action, as it would significantly weaken the Contractors' and Bond Issuers' position that the sanctions apply, including the applicability of the Italian Declaration.

38. ▮ will use the discovery it seeks by this Application in the UK Action, the Italian Sanctions Action, as well as in ▮s anticipated litigation in Italy.

39. The dispute involving the Project between ▮ and ▮ is also the subject of an arbitration before the International Chamber of Commerce, brought by ▮


against ▮ and ▮ on August 15, 2022 ("ICC Arbitration"). The ICC Arbitration is not a basis for this Application.

40. Disclosure is ongoing in the UK Action under operative disclosure rules. The discovery ▮ seeks herein does not duplicate the discovery already produced in those proceedings.

41. ▮ seeks evidence from ▮ a non-party to the UK Action, relevant to ▮ and ▮ involvement in the issuance of the Italian Declaration and the determination of the Bond Issuers' non-payment in connection with ▮ being sanctioned, and specifically that:

    a. ▮ knew of and/or participated in the Contractors' efforts to use false sanctions assertions as a pretext for suspension of the Project Agreements;

    b. ▮ directed or participated in efforts by ▮ and ▮ to supply false or misleading information about the ownership or control of ▮ to induce the Italian sanctions authorities to incorrectly add ▮ to the Italian sanctions list, thereby supporting ▮ pretext for suspending the loss-making Project Agreements; and

    c. ▮ took steps to persuade the Bond Issuers not to make payment on hundreds of millions of dollars due on the Bonds which might well have bankrupted the Contractors.

42. The UK Action is scheduled for trial commencing on June 9, 2025. While the court in the UK Action has ordered that evidence to be used at trial should be submitted by March 24, 2025, I have advised ▮ that subsequently-obtained, relevant evidence may still be submitted prior to or up to June 9, 2025.

43. There is no indication that the court in the UK Action would not accept evidence obtained by this Application. Indeed, English courts are generally receptive to evidence gathered

in § 1782 applications. Likewise, there are no proof-gathering restrictions in the UK Action so that limit ▇▇▇▇'s Application.

I, ▮▮▮▮▮ declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 28 April 2025

▮▮▮▮▮